IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| ERIKA C. MULESKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:14-cv-00713-MDH |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Plaintiff's appeal of the Commissioner's denial of her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381 et seq. Plaintiff has exhausted her administrative remedies and the matter is ripe for judicial review.[1] After carefully reviewing the files and records, the Court finds insufficient evidence to determine whether the Commissioner's decision is supported by substantial evidence. The Court hereby **REVERSES** and **REMANDS** this case to the Commissioner with directions to fully and explicitly evaluate Plaintiff's impairments under Listing 12.05.

## I. BACKGROUND

Plaintiff was born in Romania on May 13, 1990 and was adopted into an American family at the age of 15 months old. Throughout her formative years, Plaintiff exhibited below-average intelligence. She graduated from high school but attended special education classes from pre-kindergarten through high school. Following her high school graduation, Plaintiff attempted to maintain employment but was unable to hold a job for longer than three months.

---

[1] Plaintiff filed an application for SSI on February 6, 2012, alleging disability beginning on August 1, 2008. Her claim was initially denied on May 7, 2012. Plaintiff requested a hearing before an ALJ and the ALJ held a hearing on May 3, 2013. The ALJ issued a decision on May 21, 2013, denying Plaintiff's application for SSI. Plaintiff appealed that decision to the Appeals Counsel and the Appeals Council denied Plaintiff's request for a review on July 12, 2014. Plaintiff commenced the present lawsuit on August 13, 2014.

1

On February 6, 2012, at the age of 21, Plaintiff filed for disability alleging disability beginning August 1, 2008.

Plaintiff claims the following mental impairments limit her ability to work: bipolar disorder, borderline personality disorder, depression, and anxiety. Tr. 34, 132. She reported that she never feels "stable" and is always either extremely depressed, lacking energy and motivation, or manic, acting recklessly and later regretting her actions. Tr. 43-35. She reported that she suffers from racing thoughts, paranoia, extreme anxiety, and difficulty sleeping. Tr. 45-46, 153. Plaintiff states her anxiety causes panic attacks where she gets hot, nauseous, and dizzy; she states her panic attacks are triggered by "little things" such as losing her wallet, someone not saying "excuse me" at the grocery store, being around crowds, being in uncomfortable situations, being around new people or things, going to doctor's appointments, or sitting and waiting for extended periods of time. Tr. 35, 39-42. Plaintiff stated she takes medication for her mental impairments but her symptoms remain. *See* Tr. 49. She admitted she has been medication non-compliant in the past due to forgetfulness and manic episodes. *See* Tr. 44, 50.

Plaintiff claims her mental impairments negatively affect her ability to do work-related functions such as remember, concentrate, focus, complete tasks, follow directions, understand, and get along with others. Tr. 45-47, 153. She states she can pay attention for five minutes, has difficulty finishing what she starts, can follow written directions "okay" and spoken directions poorly, can tolerate authority but has trouble dealing with bosses, does not handle stress well, and does not like changes in routine. Tr. 153-54. She reports that she lives at home with her parents and siblings; she does not care for any other person or pet; she does not prepare her own meals; she needs reminders to attend appointments and take medications; she does some household chores including cleaning rooms "at a basic level," laundry, and dishes; she can drive

2

and go out in public alone but prefers that her mother goes with her due to her anxiety and her learning disability; she can count change but cannot pay bills or manage bank accounts because she does not know how to do so and has impulse control; and she visits her friend Kim "a few times a week" to watch movies or talk. Tr. 47-48, 148-152.

### Medical Records

Educational records submitted from Kansas City Public Schools show Plaintiff was administered Stanford Binet-IV Intelligence Testing in 1995 and 1998, during the course of her primary education, and received composite scores of 90 and 88, respectively. It was thereby concluded that "[Plaintiff] functions cognitively within the low average range." Although these school records appear incomplete, they indicate Plaintiff attended special education classes in 1993-1995 (pre-kindergarten), 1995-1998 (elementary), 2001-2003 (middle school), and in 2006 (high school).[2]

From January of 2011 to May of 2011, Plaintiff was treated by Doctor Everson with the Psychiatry Associates of Kansas City. Plaintiff presented as depressed and dysphoric with impaired concentration and mood swings. Doctor Everson prescribed Plaintiff Lamictal for her symptoms and, by March 2011, Plaintiff reported improvements in irritability and concentration with persisting "low days." Doctor Everson increased Plaintiff's dosage of Lamictal and, at her appointment in May 2011, Plaintiff presented with euthymic mood, full affect, and intact concentration, insight, judgment, and memory; however, she reported that her anxiety medication made her drowsy. Doctor Everson notes indicate "moods are fair" and "stable moods" but he discontinued Plaintiff's Lamictal prescription in lieu of another drug. During her

---

[2] Plaintiff reportedly received other mental health treatment and/or therapy during her adolescence but such medical records were not included in the administrative record. Plaintiff reported she was initially diagnosed with Bipolar Disorder by Doctor Lieberman in or around 2009.

3

treatment with Doctor Everson, Plaintiff's GAF score raised from a 65 during her first two visits to an 80 her third visit.[3]

On September 2, 2011, Plaintiff voluntarily admitted herself to The Research Psychiatric Center due to alleged severe depression, rapid mood swings, anxiety, anger management issues, and self-reported deficits in concentration/memory, panic attacks, and nightmares. She stated she was diagnosed with Bipolar Disorder three years earlier and had since refused to take her medication (Abilify and Trazodone), been to jail three times, and been raped by multiple men. Intake notes state Plaintiff "has been having lots of problems with mood swings, impulsive actions, and high risk behaviors" and "she has an addictive component . . . as well in terms of her impulsive behavior involves sexual addiction as well as possible substance addiction." Throughout the course of her treatment at Research, Plaintiff exhibited labile mood, poor insight/judgment, irritability, racing thoughts, tangential and wide ranging thoughts and speech, and impulsive hypersexuality. Doctor Khoury diagnosed Plaintiff with Bipolar Disorder and "likely borderline personality disorder." With prescribed medication (Depakote, Celexa) and the structure of the program, Doctor Khoury reported that Plaintiff "seemed to slowly improve over the course of care" and "showed decreasing impulsive thoughts, less anger, less irritability, [and] more forward-thinking plans." Plaintiff was discharged on or around September 30, 2011.

In January of 2012, Plaintiff began outpatient psychiatric treatment at Rediscover Mental Health. She reported that she went to Research for treatment, which helped for a while, but she had since gone downhill due to lack of after-care programming and lack of medication. At her initial intake appointment with Rediscover, Plaintiff reported panic attacks, mood swings, sex

---

[3] A GAF score of 61-70 is associated with "[m]ild symptoms in one area OR difficulty in one of the following: social, occupational, or school functioning. BUT, the person is generally functioning pretty well and has some meaningful interpersonal relationships." DSM-IV. A GAF score of 71-80 indicates "symptoms/problems, but they are temporary, expectable reactions to stressors. There is no more than slight impairment in any area of psychological functioning." DSM-IV.

4

addiction, anger problems, difficulty focusing/concentrating, and learning disabilities. She stated she has flight of ideas, ideas of hopelessness, anxious and irritable mood, paranoia, flat affect, distractibility problems, and working memory problems. Doctor Khan met with Plaintiff and prescribed her Risperdal for her alleged impairments. From February to May of 2012, Plaintiff reported marked improvements in mood, mood swings, anxiety, irritability, anger, and impulsiveness. Between June and October of 2012, Plaintiff missed three of her monthly appointments with Doctor Khan and, when she did attend, she appeared unkept with a dysphoric or flat affect and slowed speech/processing. Around that time period, Doctor Khan questioned the veracity of Plaintiff's statements that she was compliant with her medication and he noted his belief that Plaintiff's amotivation and lack of structure is not caused by her depression. In November and December of 2012, Plaintiff again met with Doctor Khan and reported improvements in depression, anger/irritability, paranoia, and sleep. She cancelled her appointment in January 2013 with less than 24 hours' notice. In February of 2013, Plaintiff brought a disrespectful friend with her to her appointment with Doctor Khan, expressed her desire to have sex, and exhibited a superficial fund of knowledge and restricted affect. In March of 2013, Plaintiff brought a different friend with her to her appointment and was apologetic, anxious, and somatically preoccupied. During this time period, Plaintiff's GAF scores ranged from 49 to 51.[4] Doctor Khan diagnosed Plaintiff with Generalized Anxiety Disorder, Bipolar Affective Disorder (with psychotic features), other psychotic and mood disorders not otherwise specified, and Borderline Personality Disorder.

Doctor Richardson, Plaintiff's primary care physician, also submitted medical records from his treatment of Plaintiff from December 2010 to May 2013. Doctor Richardson's

---

[4] A GAF score of 41-50 indicates "[s]erious symptoms OR serious impairment in one of the following: social, occupational, or school functioning." DSM-IV. A GAF score of 51-60 indicates "[m]oderate symptoms OR moderate difficulty in one of the following: social, occupational, or school functioning." DSM-IV.

5

treatment notes generally concern Plaintiff's physical conditions but they do cite Plaintiff's mental diagnoses, reference Plaintiff's narratives concerning a racing mind and stressed/anxious feelings, indicate Plaintiff requested and underwent multiple pregnancy and STD tests, and reveal Plaintiff was prescribed medication for insomnia.

## Decisions of the Commissioner

Plaintiff's application for SSI was initially denied on April 18, 2012, based in large part on a disability determination made by Doctor Aram, a state agency psychological consultant. Doctor Aram found Plaintiff suffers from severe impairments including affective disorder (12.04), anxiety-related disorder (12.06), and personality disorder (12.08); however, he concluded that "[a]lthough your condition is currently severe, it is expected to improve and will not result in significant limitations in your ability to perform basic work activities . . . your condition is not expected to remain severe enough for 12 months in a row to keep you from working." Tr. 64-67.

Plaintiff appealed the initial decision to the ALJ and presented updated information, additional medical records, and testimony. The ALJ issued a written decision on May 21, 2013 denying Plaintiff's application for disability. The ALJ found that Plaintiff suffers from severe impairments including "borderline personality disorder, bipolar disorder versus mood disorder and psychotic disorder, anxiety disorder, [and] history of learning disorder[.]" He found that Plaintiff's impairments do not meet or medically equal the severity of one of the listed impairments; specifically, he stated "[t]he severity of claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.02, 12.03, 12.04, 12.06, and 12.09" and explained that Plaintiff's mental impairments satisfied neither the "paragraph B" criteria nor the "paragraph C" criteria. The ALJ determined that Plaintiff retained

6

the residual functional capacity to perform a full range of work at all exertional levels but with non-exertional limitations that Plaintiff can perform "no more than simple routine unskilled work in a low-stress environment, with no more than occasional contact with co-workers or the general public." Considering Plaintiff's age, education, work experience, and RFC, the ALJ found Plaintiff can perform jobs that exist in significant numbers in the national economy.

Plaintiff appealed to the Appeals Council and submitted two additional pieces of evidence. First, Plaintiff submitted a school evaluation from May 24, 2006, showing Plaintiff was administered a Stanford-Binet Intelligence Test on May 1, 2006 and earned a full scale IQ score of 72 and a verbal IQ score of 68. The evaluation team concluded Plaintiff suffers from "deficits in basic psychological processing" and "meets the eligibility criteria to be diagnosed with a specific learning disability[.]" Second, Plaintiff submitted a medical impairment questionnaire dated July 11, 2013 and completed by Doctor Wurster, who allegedly treated Plaintiff as early as fall of 2006. Doctor Wurster cited Plaintiff's diagnoses of Bipolar Disorder, Borderline Personality Disorder, and IQ of 72, and he checked boxes indicating Plaintiff suffers from "marked" limitations of daily activities, "marked" limitations in social functioning, and "extreme" deficiencies in concentration, persistence, and pace. He wrote that Plaintiff has "constant" issues with attention and concentration, difficulty following directions, and reduced intellectual functioning. Doctor Wurster stated the foregoing limitations have been present since August 1, 2008 and before. He opined that Plaintiff is likely to be absent from work at least four days per month due to her conditions and would have difficulty working at a regular job on a sustained basis. The Appeals Council stated it considered the additional evidence submitted by Plaintiff but "found that this information does not provide a basis for changing Administrative Law Judge's decision." The Council denied Plaintiff's request for review.

7

Case 4:14-cv-00713-MDH   Document 20   Filed 08/10/15   Page 7 of 13

## II. STANDARD

Judicial review of the Commissioner's decision is limited to whether substantial evidence supports the findings of the Commissioner and whether the correct legal standards were applied. *See* 42 U.S.C. §§ 405(g), 1383(c)(1)(B)(ii)(3). Substantial evidence is less than a preponderance of the evidence and requires enough evidence to allow a reasonable person to find adequate support for the Commissioner's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Freeman v. Apfel*, 208 F.3d 687, 690 (8th Cir. 2000). This standard requires a court to consider both the evidence that supports the Commissioner's decision and the evidence that detracts from it. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). That the reviewing court would come to a different conclusion is not a sufficient basis for reversal. *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009). "If, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits." *Id.* (quoting *Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir. 1996)).

## III. DISCUSSION

Plaintiff argues the decision of the Commissioner is erred in three respects: (1) the Appeals Council failed to properly consider Plaintiff's additional evidence showing Plaintiff's mental impairments meet Listing 12.05C; (2) the ALJ failed to properly account for Plaintiff's moderate limitations in concentration, persistence, and pace when fashioning her RFC; and (3) the ALJ failed to properly weigh the opinion evidence of record. The Court agrees that Plaintiff's impairments appear to satisfy Listing 12.05C and that the Commissioner failed to adequately explain its decision in that regard. Accordingly, the Court remands on that basis and need not address Plaintiff's second and third arguments.

Listing 12.05 provides a presumption of benefits for certain persons who are intellectually disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. Intellectual disability, as used in Listing 12.05, means "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." *Id.* An intellectual disability triggers presumed benefits under Listing 12.05 only where the above definition is satisfied and the claimant satisfies one of four scenarios. *Id.* One such scenario, described in 12.05C, exists where the claimant has "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]" *Id.* at § 12.05C. To show entitlement to benefits under Listing 12.05C, therefore, the claimant must establish: "(1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006).

Under 20 C.F.R. § 404.970(b), "if a claimant files additional medical evidence with a request for review prior to the date of the Secretary's final decision, the Appeals Council MUST consider the additional evidence if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990). Evidence is "new" if it is "more than merely cumulative of other evidence in the record." *Lamp v. Astrue*, 531 F.3d 629, 632 (8th Cir. 2008) (citing *Bergmann v. Apfel*, 207 F.3d 1065, 1069 (8th Cir. 2000)). Evidence is "material" if it is "relevant to claimant's condition for the time period for which benefits were denied." *Id.*

9

Here, Plaintiff's additional medical evidence is new, material, and relates to the period on or before the date of the ALJ's decision. Both pieces of evidence are new in that they provide vital information not cumulative of other evidence in the record – an updated IQ,[5] evidence of childhood intellectual functioning, and a medical opinion from a treating physician/examining source concerning work-related limitations. Both pieces of evidence are material because they will help determine whether Plaintiff's impairments, during the relevant time period, satisfied Listing 12.05C. Plaintiff's school records concern a time period prior to the alleged onset of disability but are relevant to the issue of IQ and onset before age 22, which are implicated by Listing 12.05C. Doctor Wurster's opinion questionnaire, although submitted a couple months after the ALJ's decision, relates to Plaintiff's impairments and significant work-related functions during the relevant time period (i.e. examined Plaintiff as early as 2006 and stated the limitations included in his questionnaire have been present since August 1, 2008).[6]

---

[5] The school report includes the most recent and reliable IQ test, which was administered less two weeks shy of Plaintiff's sixteenth birthday. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 112.00D(10) ("Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior. IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above. IQ test results obtained before age 7 are current for 2 years if the tested IQ is less than 40 and 1 year if at 40 or above.").

[6] *See generally Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990) ("The timing of the examination is not dispositive of whether evidence is material. . . . Medical evidence obtained after an ALJ decision is material if it relates to the claimant's condition on or before the date of the ALJ's decision. In this case Dr. Wheatt's report states that '[t]his patient has suffered from chronic mental illness since her early adult hood [sic].' Although this statement does not identify the date Ms. Williams' disability began, it does provide a sufficient basis to conclude that Dr. Wheatt's report relates to the period on or before the date of the ALJ's decision of September 28, 1987. Therefore, Dr. Wheatt's report is material under section 404.970(b) and the Appeals Council erred in refusing to consider it." (internal citations omitted)); *Bergmann v. Apfel*, 207 F.3d 1065, 1070 (8th Cir. 2000) ("This additional evidence [3 post-hearing doctor visits and ultimate diagnosis re: ability to work] outlines the progress of Bergmann's condition from before the time of the ALJ's decision and culminates in Dr. Burnap's October 2, 1997, conclusion that she is disabled and cannot maintain gainful employment. . . . It is material because, although it involves deterioration, that deterioration occurred over the course of Dr. Burnap's treatment, specifically including the time period before the ALJ."); *Bradford v. Barnhart*, No. 4:01CV3267, 2003 WL 1811534, at *19 n. 11 (D. Neb. Apr. 7, 2003) ("The defendant points out that the evaluations contain opinions that are partly retrospective, since the designated evaluation period begins prior to Dr. Bence's first treatment of the plaintiff in March 1999. However, it seems to me that the defendant's observation is relevant to the weight to be accorded to Dr. Bence's opinions, as opposed to their materiality.").

The Appeals Council explicitly acknowledged and considered the two additional pieces of evidence submitted by Plaintiff but found no basis to alter the ALJ's decision. Threrefore, the Appeals Council satisfied its obligation under 20 C.F.R. § 404.970(b) and the Court's role is limited "to deciding whether the administrative law judge's determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made." *See Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994); *see, e.g., Rios v. Colvin*, No. 5:12CV00156 JLH, 2013 WL 3481028, at *9 (E.D. Ark. July 10, 2013); *Albers v. Astrue*, No. 4:12CV3050, 2012 WL 6680365, at *15 (D. Neb. Dec. 21, 2012). This task is especially difficult where, as here, Plaintiff failed to cite Listing 12.05C during any phase of the administrative process, the ALJ did not explicitly address Plaintiff's impairments under Listing 12.05C, and the Appeals Council submitted an extremely cursory opinion.

The Court is unable to ascertain on this particular record whether the ALJ's denial of Plaintiff's application under Listing 12.05C is supported by substantial evidence. *See generally Chunn v. Barnhart*, 397 F.3d 667, 672 (8th Cir. 2005); *Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999). The record appears to support each element of Plaintiff's claim – (1) Plaintiff received a valid verbal IQ score of 68 just prior to her sixteenth birthday;[7] (2) evidence supports the conclusion that Plaintiff's sub-average intelligence manifested prior to age 22 and was accompanied by deficits in adaptive functioning – for example, Plaintiff attended special education classes from pre-kindergarten through high school, she suffered difficulty with normal tasks such as following directions, managing money, and reading a recipe, she required assistance at appointments and to complete forms, and she engaged in hypersexual behaviors,

---

[7] "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, the lowest of these is used in conjunction with listing 112.05." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 112.00D(9).

substance abuse, and altercations resulting in jail time;[8] and (3) Plaintiff suffers from clinically diagnosed anxiety and bipolar disorder in addition to her intellectual disability and these other mental impairments result in additional work-related limitations.[9] Even assuming Plaintiff's impairments do not *meet* Listing 12.05C,[10] there is no assessment in the record regarding whether Plaintiff's impairments *medically equal* Listing 12.05C. *See Shontos v. Barnhart*, 328 F.3d 418, 424-25 (8th Cir. 2003). Accordingly, the Court will reverse and remand this case with directions for the ALJ to explicitly consider Listing 12.05C in light of the newly-received evidence and the record as a whole.

## CONCLUSION

For the reasons set forth herein, the Court is unable to determine whether substantial evidence on the record as a whole supports the ALJ's disability determination. Accordingly, the Commissioner's denial of benefits is **REVERSED and REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

---

[8] *See, e.g., Maresh v. Barnhart*, 438 F.3d 897, 900 (8th Cir. 2006) (sufficient evidence of onset during developmental period where claimant struggled in special education classes through ninth grade, dropped out of high school, had trouble with reading, writing and math, and exhibited deficits in adaptive functioning by fighting with other kids); *see also Lott v. Colvin,* 772 F.3d 546, 550 (8th Cir. 2014) (sufficient evidence of onset during developmental period where attended special education classes in science and math, did not complete high school, had violent altercations, and tried to burn down a home); *Christner v. Astrue*, 498 F.3d 790, 793 (8th Cir. 2007) (sufficient evidence of onset during developmental period where low-grade dropout and prior participation in special education classes).

[9] "Based on these statements of the Commissioner and corresponding regulations, an impairment will be deemed to impose an additional and significant work-related limitation of function if the impairment is "severe" as defined by § 416.920(c)." *Monroe v. Astrue*, 848 F. Supp. 2d 961, 984 (D. Minn. 2011). Here, the ALJ found Plaintiff suffered from additional severe impairments including borderline personality disorder, bipolar disorder, and anxiety disorder.

[10] The Commissioner now defends its decision by arguing Plaintiff's treating mental health professionals did not note any significant cognitive deficits, Plaintiff's impairments did not interfere with her self-directed leisure activities, the 2006 school report classified Plaintiff's verbal IQ score as "mildly delayed" and stated she had a learning disability but specifically ruled out mental retardation, and Dr. Wurster's opinion is not supported. The Court notes that Plaintiff's medical examiners were never asked to assess intelligence or conduct testing on cognitive defects, nor did the Commissioner seek such a determination from a CE; moreover, one could attribute many of Plaintiff's reported symptoms – i.e. frustration, anxiety, agitation, difficulty following directions – to low intelligence. The Court further notes that Plaintiff's reported leisure activities include watching television or movies, talking, shopping, drug use, and sex do not require much intellectual functioning.

12

**IT IS SO ORDERED**.

Dated: August 10, 2015

             */s/ Douglas Harpool*
             **DOUGLAS HARPOOL**
             **UNITED STATES DISTRICT JUDGE**